Slip Op 08-88

UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————
UNIVERSAL POLYBAG CO., LTD., et al.,:
                                    :
            Plaintiffs,             :
                                    :       Before:              WALLACH, Judge
        v.                          :       Consol. Court. No.:  07-00043
                                    :
UNITED STATES,                      :       **PUBLIC VERSION**
                                    :
            Defendant,              :
                                    :
        and                         :
                                    :
POLYETHYLENE RETAIL CARRIER         :
BAG COMMITTEE, et al.,              :
                                    :
            Defendant-Intervenors.  :
———————————————————   :

[Plaintiff's Motion for Judgment on the Agency Record is DENIED; Defendant-Intervenors' Motion for Judgment on the Agency Record is DENIED; and the Agency's Determination is AFFIRMED].

Dated: August 28, 2008

Riggle & Craven (David J. Craven) for Plaintiff King Pac Industrial Co., Ltd.

Gregory G. Katsas, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Brach, Civil Division, U.S. Department of Justice (Sameer Yerawadekar); and Mark Lehnardt, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant United States.

King & Spalding LLP (Joseph W. Dorn, Stephen A. Jones, Daniel L. Schneiderman, and Elizabeth Duall) for Defendant-Intervenors Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation.

## OPINION

**Wallach, Judge**

## I
## INTRODUCTION

Plaintiff King Pac Industrial Co., Ltd. ("King Pac") and Defendant-Intervenors Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation (collectively "the Committee") challenge different aspects of the United States Department of Commerce's ("Commerce" or "the Department") findings in Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg. 1,982 (January 17, 2007) ("Final Results") covering the period January 26, 2004 through July 31, 2005. This court has jurisdiction pursuant to 28 U.S.C. § 1581(c). Because Commerce acted within its discretion, its determinations are sustained.

## II
## BACKGROUND

Commerce entered an antidumping order on certain polyethylene retail carrier bags ("PRCBs") from Thailand on August 9, 2004. Antidumping Duty Order: Polyethylene Retail Carrier Bags from Thailand, 69 Fed. Reg. 48,204 (August 9, 2004). The following year, the Committee requested a review of King Pac and eleven other companies in response to the Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review, 70 Fed. Reg. 44,085, 44,086 (August 7, 2005). The Department then initiated an administrative review of the companies' exports of PRCBs during the period of review. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 70 Fed. Reg. 56,631, 56,632 (September 28, 2005).

On September 11, 2006, Commerce published its preliminary results, in which it determined that due to difficulties in verification the use of facts available was necessary and the application of adverse inferences was warranted. Polyethylene Retail Carrier Bags from Thailand: Preliminary Results of Antidumping Duty Administrative Review, 71 Fed. Reg. 53,405, 53,407 (September 11, 2006) ("Preliminary Results").  The Department selected an adverse facts available ("AFA") rate of 122.88%, determining that the rate was reliable and relevant, and corroborated "to the extent practicable." Id.  Commerce also determined that the provisional measure cap, 19 U.S.C. § 1673f(a), applied, and so the merchandise was to be liquidated at the lesser of (1) the 122.88% rate that was assigned in the review, or (2) the amount of the bond or cash deposit provided upon entry. Release of Final Results and Draft Liquidation Instructions (January 10, 2007), Public Record ("P.R.") 278.  The rate was therefore capped at the amount of the cash deposit provided upon entry of the merchandise.  On October 11, 2006 King Pac filed a brief challenging Commerce's conclusions from the verification, and arguing that Commerce should not have applied adverse facts, or in the alternative, should have only applied partial adverse facts.  On the same date, the Committee filed a brief arguing that the Department did not properly apply the provisional measures cap to King Pac's exports in this review.[1]  Commerce published on January 17, 2007, the final results of its review, determining that the application of an AFA rate was warranted, and that the provisional measures cap was correctly applied to cap the duties at the amount collected prior to to preliminary review. Final Results, 72 Fed. Reg. 1,982; Issues and Decisions Memorandum for the Antidumping Duty Administrative Review of Polyethylene Retail Carrier Bags from Thailand for the Period of Review January 26, 2004 through July 31, 2005 (January 9, 2007), P.R. 274 ("I&D Memo") cmt.

---

[1] King Pac and the Committee each filed a rebuttal brief to the other's argument on October 19, 2006.

10, at 25-27, cmt. 11, at 29-31 (AFA rate), cmt. 12, at 32 (provisional measures cap).  On

February 16, 2007, Plaintiff and Defendant-Intervenors timely initiated their actions.[2]

### III
### STANDARD OF REVIEW

This court will sustain an agency's findings, conclusions, or determinations unless they

are "unsupported by substantial evidence on the record, or otherwise not in accordance with

law." 19 U.S.C. § 1516a(b)(1)(B)(i); see Magnesium Corp. of Am. v. United States, 166 F.3d

1364, 1368 (Fed. Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340

U.S. 474, 477, 71 S. Ct. 456, 95 L. Ed. 456 (1951) (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  Courts have deemed substantial evidence to

be "something less than the weight of the evidence," and have found that "the possibility of

drawing two inconsistent conclusions" from the evidence presented will not necessarily prevent

an agency's finding from being supported by substantial evidence.  Consolo v. Fed. Mar.

Comm'n, 383 U.S. 607, 619-20, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966) (citing NLRB v.

Nevada Consol. Copper Corp., 316 U.S. 105, 106, 62 S. Ct. 960, 86 L. Ed. 1305 (1942); Keele

Hair & Scalp Specialists, Inc. v. FTC, 275 F.2d 18, 21 (5th Cir. 1960)).

When evaluating Commerce's statutory interpretation the court uses a two step analysis,

first examining whether Congress has "directly spoken to the precise question at issue."

Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S. Ct. 2778, 81

L. Ed. 2d 694 (1984).  If this is the case, courts then must "give effect to the unambiguously

---

[2] King Pac's action, originally court number 07-00049, and the Committee's action, originally court number 07-00054, were consolidated under court number 07-00043, Universal Polybag Co., Ltd. v. United States (in which the Committee had already intervened as Defendant-Intervenors).  Subsequently, Plaintiff Universal Polybag Co., Ltd. and all other parties involved in its action stipulated to dismissal. Stipulation of Dismissal (September 7, 2007) Docket Number 35.

expressed intent of Congress." Id. at 842-43; see Household Credit Servs. v. Pfennig, 541 U.S. 232, 239 124 S. Ct. 1741, 158 L. Ed. 2d 450 (2004).  If instead Congress has left a "gap" for Commerce to fill, the agency's regulation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 843-44.  Additionally, in matters of statutory construction this court will show "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 13 L. Ed. 2d 616 (1965).  The agency's construction need not be the only reasonable one or even the same result this court would have reached had the question arisen in the first instance in a judicial proceeding. Id. (citing Unemployment Comp. Comm'n of Alaska v. Aragon, 329 U.S. 143, 153, 67 S. Ct. 245, 91 L. Ed. 136 (1946)).

## IV
## DISCUSSION

### A
### Commerce's Determination to Resort to Facts Available and to Use Adverse Inferences to Determine King Pac's Dumping Margin was Appropriate, and the AFA Rate Chosen was Sufficiently Corroborated

During an antidumping investigation, Commerce is to resort to the use of facts available to reach a determination when necessary information is not available or not provided appropriately by the interested party. 19 U.S.C § 1677e(a).  According to the statute:

> (a) In general. If--
>   (1) necessary information is not available on the record, or
>   (2) an interested party or any other person--
>     (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
>     (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
>     (C) significantly impedes a proceeding under this title, or
>     (D)provides such information but the information cannot be verified as provided in section 1677m(i) of this title, the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the

facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. § 1677e(a).  In cases where the Department resorts to the use of facts available, it must first "promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle." 19 U.S.C. § 1677m(d).  The Department cannot decline to consider information that is provided by an interested party and is necessary to the determination but fails to meet the agency's requirements if:

 (1) the information is submitted by the deadline established for its submission,
 (2) the information can be verified,
 (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
 (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] or the Commission with respect to the information, and
 (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).  If a party's explanation of the deficiency is untimely or insufficient and one of the above five factors is not met, Commerce may disregard all or part of the information provided and use the facts otherwise available. 19 U.S.C. § 1677e(a).

Additionally, Commerce is permitted to apply an adverse inference when selecting from facts otherwise available if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b).  The "best of its ability" standard has been interpreted to mean that Commerce must examine a respondent's actions in order to determine whether it "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (finding that "the statutory mandate

that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do").  This standard does not require perfection, but does assume that "importers are familiar with the rules and regulations that apply to the import activities undertaken." Id.

## 1
## Commerce Properly Resorted to Facts Available

Commerce determined that the use of facts available was necessary in this case, explaining that King Pac's behavior met all four of the elements listed under 19 U.S.C. § 1677e(a).  According to Commerce, Plaintiff withheld information, failed to provide information in a timely manner, significantly impeded the review, and provided information that could not be verified.[3]  Commerce's findings were supported by substantial evidence on the record and in accordance with law, and therefore its use of facts available was proper.

### a
### The Parties' Contentions

Plaintiff argues that Commerce was wrong to resort to facts available because, contrary to Commerce's findings, it submitted its "minor corrections in the form and manner that [King Pac] believed to be permitted by Commerce." Motion for Judgment on the Agency Record Submitted Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade ("Plaintiff's Brief") at 11.  Plaintiff claims that while Commerce found that certain changes in the revised home market sales listing were not "directly identified" in the minor corrections submitted by King Pac, the information was "of record with Commerce and available for verification." Id. at 12.  According to Plaintiff, the minor changes that were reported in the computer data response but not in the

---

[3] Any one of these factors, if met, is enough to require Commerce to use facts available under 19 U.S.C. § 1677e(a).

minor corrections narrative were either "previously reported in the data or very minor in nature." Id. at 12-13.[4]

Defendant responds that Commerce's determination that King Pac failed to provide significant information by the deadlines set or in the manner and form requested is supported by substantial evidence and in accordance with law. Defendant's Opposition to Plaintiffs' Motions for Judgment Upon the Administrative Record ("Defendant's Response") at 20.  According to Defendant, King Pac withheld some necessary information until after the applicable deadlines, and in some cases failed to submit the information entirely, as well as failed to provide Commerce with a complete list of its minor changes at the start of verification as was requested. Id. at 21.  Defendant also notes that while King Pac labels changes identified by Commerce as "trivial" or "simple," it does not dispute that it failed to produce these things by their deadlines. Id. at 22 (citing Plaintiff's Brief at 13-15).  Defendant asserts additionally that several of the undisclosed changes in question were "anything but minor," and in fact were "critical to the calculation of normal value and, therefore, the calculation of the margin."[5] Id. at 23 (quoting I&D Memo cmt. 10, at 26; see Verification of the Sales Response of King Pac Industrial Co., Ltd. in the Antidumping Review of Polyethylene Retail Carrier Bags from Thailand (August 31, 2006), P.R. 228, Confidential Record ("C.R.") 107 ("Verification Report") at 11).

---

[4] Plaintiff identifies these "minor" corrections as: (1) returned sales which King Pac had failed to delete from the initial data base, (2) a difference in quantity in pieces on three invoices, (3) an adjustment of the price to reflect the improper inclusion of VAT in the gross unit price for some sales, (4) a discount that was excluded on certain home market sales transactions, (5) typographical errors on 7 invoices, (6) an incorrect indirect selling expense ratio to certain sales, and (7) a change in the conversion factor, with a total difference in quantity of [ a certain percentage ]. Plaintiff's Brief at 13-16.

[5] Defendant also provides the example from information previously undisclosed, "changes [ in quantities in kilograms in a certain number of transactions—to the magnitude of up to a certain percentage and over a certain number of metric tons of plastic bags in individual transactions ]." Defendant's Response at 23 (citing Letter from James R. Simoes, Hunton & Williams LLP, to Secretary of Commerce, Re: A-549-821 Polyethylene Retail Carrier Bags from Thailand: Sales Reconciliation of King Pac Industrial Co., Ltd. (June 27, 2006) P.R. 200, C.R. 87, Ex. 6, at 43, 65.  Defendant asserts that these are particularly significant changes because they "affect how adjustments are allocated across sales because they are allocated on a per kilogram basis." Id.

Plaintiff also argues that Commerce's allegation that King Pac withheld information that the Department requested is without merit.[6] Plaintiff's Brief at 18.  King Pac contends that though Commerce claims that Plaintiff impeded the investigation by not providing accurate and necessary information, Commerce "failed to identify from the record evidence the information that was allegedly withheld by [King Pac] and how [King Pac] failed to provide" the necessary information in question. Id.  According to Plaintiff, "Commerce has essentially set an impossible standard of requiring perfection and consistency from the initial response" because any changes to the data will render it in a "state of flux," but failure to change the data makes King Pac unresponsive. Id. at 19.  Additionally Plaintiff says that other respondents were also issued multiple supplemental questionnaires but not ultimately found to be deficient or in a "state of flux." Id. at 20-21.  Plaintiff also argues that the contention that it significantly impeded the administrative review is untrue. Id. at 21.  According to Plaintiff, it provided "full and complete responses to Commerce questionnaires" and actively participated in two back to back verifications, submitting all information requested by Commerce. Id. at 21-22.

Defendant counters that Commerce's determination that King Pac withheld requested information was supported by substantial evidence and in accordance with law. Defendant's Response at 18 (citing I&D Memo cmt. 10, at 25-27).  According to Commerce, King Pac "withheld information about, among other things, changes to its sales database, the conversion factor needed to make the adjustments to gross unit prices required to calculate the dumping margin, and documentation required to verify the accuracy of King Pac's sales database." Id.  Defendant asserts that it catalogued repeated instances demonstrating that King Pac failed to

---

[6] In its Reply, King Pac concludes that the assertion that it withheld information is "technically correct," but says that the real issue is Commerce cannot hold a respondent to a standard of perfection. Reply to Defendant and Defendant-Intervenor's Response to Plaintiff's Motion for Judgment on the Agency Record ("Plaintiff's Reply Brief") at 11.

provide the information Commerce requested, even after second requests. Id. at 19-20 (citing I&D Memo cmt. 10, at 25-27, cmt. 11, at 29-31).

Defendant also asserts that King Pac's withholding of information and failure to timely submit information severely impeded Commerce's investigation, and therefore Commerce's decision to turn to facts available was proper. Id. at 23-24. According to Defendant, Plaintiff's contention that Commerce only made "nebulous references" to the undisclosed changes is untrue, and in fact Commerce explicitly referred to its original rationale behind applying AFA and the factual underpinnings of that rationale in the verification report. Id. at 24. Defendant also addresses Plaintiff's argument that Commerce applied an "impossible perfection" standard, saying that Commerce applied the standard set forth in 19 U.S.C. § 1677e(a) and § 1677m(d) and (e) when it gave King Pac notice of its deficiency and the opportunity to remedy it, and then disregarded "all or part of the original and subsequent responses" when further submissions were incomplete or untimely. Id. at 25.

Finally, Plaintiff contends that the allegation that its information could not be verified is incorrect. Plaintiff's Brief at 16. According to Plaintiff, with the exception of minor changes[7] Commerce did not identify any information that could not be verified, and all necessary information was verified according to the Verification Report. Id. at 16-17. Plaintiff points to the Verification Report saying that to verify items Commerce "used both the old and new [home market] databases interchangeably" when they were identical, and stating that worksheets were tied to revised databases presented by King Pac in order to verify information. Id. at 17 (quoting Verification Report at 4, 12).

---

[7] Plaintiff asserts that "such changes were either trivial or had previously been disclosed . . . [and] were verifiable even if some of them were not directly identified in the initial list of minor corrections." Plaintiff's Brief at 17.

Defendant responds that Commerce's determination that it was appropriate to resort to facts available because information submitted by King Pac could not be verified was supported by substantial evidence and in accordance with law. Defendant's Response at 26.  According to Defendant, the unverifiable information was documented by Commerce throughout the Verification Report and in the AFA Memorandum. Id. at 27 (citing I&D Memo cmt. 10, at 25-27; Memorandum from Richard Rimlinger to Laurie Parkhill, Polyethylene Retail Carrier Bags from Thailand – Decision to Apply Adverse Facts Available and the Appropriate Rate for the Preliminary Results of Review (August 31, 2006), P.R. 226, C.R. 105 ("AFA Memo"). Defendant asserts that Plaintiff's statement in its brief that Commerce accepted and verified the revised database with its minor corrections is incorrect, and that in fact, "Commerce cannot accept or verify changes about which it does not know until after verification, or for which it has no explanation at all.  King Pac precluded Commerce from verifying its minor corrections by not disclosing all of the changes it made to its sales data." Id. at 28.  Defendant also refutes that Commerce found the pre- and post-verification minor corrections databases to be interchangable as Plaintiff claims, and quotes the Verification Report as continuing on to say, "we realized that the list of minor corrections did not include descriptions of all changes [King Pac] had made to the corrected databases," to make the point that Commerce could not ultimately verify the revised databases. Id. at 29 (quoting Verification Report at 4).

King Pac alternatively argues that even if the Department's determination that King Pac's home market sales data were not usable was proper, Commerce should have applied only partial and non-adverse facts available by using King Pac's reported U.S. sales and cost of production ("COP") data to calculate the margin. Plaintiff's Brief at 25.  Plaintiff asserts that Commerce "erred when it rejected [King Pac's] data in its entirety even if it decided not to use [King Pac's]

home market sales database of the dumping margin calculation" because the deficiency is "isolated and not relevant to other data." Id. at 25-26.  According to Plaintiff, Commerce could have rejected the home market sales data and still properly relied upon the COP and U.S. sales databases in order to calculate a fair dumping margin. Id. at 26.

Defendant counters that Commerce's decision to disregard all of King Pac's submissions is supported by substantial evidence and in accordance with law. Defendant's Response at 29.[8] According to Defendant, King Pac failed to act to the best of its ability in providing information to Commerce, as is required by 19 U.S.C. § 1677m(e)(4), because "it had all of the information in its records but only provided it to Commerce, if at all, after it could no longer be verified." Id. at 30.

b
<u>Commerce's Determination to Use Facts Available was Supported by Substantial Evidence and in Accordance with Law</u>

Commerce's findings were supported by substantial evidence on the record and in accordance with law in each of the four determinations regarding the factors listed in 19 U.S.C. § 1677e(a)(2), and therefore its use of facts available was proper.

First, the Department is correct in its assertion that King Pac withheld information and failed to timely provide information to Commerce in the form and manner it was requested. Though King Pac asserts that Commerce failed to identify evidence from the record of information that was withheld, an examination of the Verification Report and the AFA Memo, both referenced by Commerce in its I&D Memo, reveals Commerce does detail specific information it found withheld by Plaintiff. I&D Memo cmt. 10, at 25-26; Verification Report at 19-28; AFA Memo at 2-3.  In fact, as Commerce notes King Pac withheld information requested

---

[8] Defendant asserts that Commerce provided Plaintiff with notice of its deficient response and an opportunity to remedy or explain the deficiency in accordance with 19 U.S.C. § 1677m(d). Defendant's Response at 29-30. Plaintiff does not dispute this.

about its minor corrections. After those undisclosed changes were discovered and King Pac again asserted that it disclosed all previously undisclosed changes, Commerce still found the submission was incomplete.[9] I&D Memo cmt. 10, at 25.  King Pac also withheld information requested about conversion factors for units used to report bag quantities, which were needed because Commerce's adjustments to gross unit price are made on a per-kilogram basis. Id. cmt. 10, at 26; Verification Report at 11.  Additionally, Commerce found that despite several requests, Plaintiff withheld documentation that was necessary to conduct sales traces. Verification Report at 19; see Verification Agenda for King Pac Group, Letter from Laurie Parkhill, Director AD/CVD Enforcement, Import Administration, to Jay Simoes, Hunton & Williams LLP (June 2, 2006), P.R. 186, C.R. 77 ("Verification Agenda") at 2-9.  These omissions are more than enough to establish that King Pac withheld information under the 19 U.S.C. § 1677e(a)(2) standard.

King Pac also failed to provide information in time for deadlines and in the form and manner requested, the second requirement of 19 U.S.C. § 1677e(a)(2).  Plaintiff states that it submitted its information in a form and manner it "believed to be permitted" by Commerce, Plaintiff's Brief at 11, but King Pac's unsupported and unreasonable belief  is not relevant to the inquiry. Nippon Steel Corp., 337 F.3d at 1381 ("The focus of subsection (a) is respondent's failure to provide information. [emphasis in original]  The reason for the failure is of no moment."); Tianjin Mach. Imp. & Exp. Corp. v. United States, No. 05-00522, 2007 Ct. Int'l. Trade LEXIS 137, at *7 (August 28, 2007) ("It is well settled that a party's intent is irrelevant to a decision to use facts available.").  Further, the Verification Agenda specifically informed Plaintiff that minor errors were to be reported to Commerce officials at the beginning of

---

[9] In the Verification Report Commerce explains that after finding an undisclosed change it questioned King Pac, which assured Commerce that this was the only change made to the reported data that it had not disclosed. However, "[Commerce] briefly compared the original and revised databases for the [home market] and immediately found multiple other undisclosed corrections." Verification Report at 24.

verification. Verification Agenda at 2.  King Pac's claim that it was unaware that submissions were to be made at the beginning of verification was inexcusable under the circumstances. <u>See</u> <u>Chia Far Indus. Factory Co., Ltd. v. United States</u>, 28 CIT 1336, 1357, 343 F. Supp. 2d 1344 (2004) (finding that "the failure to tell Commerce the truth is inexcusable even if it was 'inadvertent'").  Additionally, Plaintiff asserts for several of the changes that King Pac modified the computer data so adjustments would be apparent. Plaintiff's Brief at 13-16.  It does not dispute, however, that it failed to notify Commerce of the changes prior to the deadline as Commerce requests.  That is a specific statutory requirement. <u>See</u> 19 U.S.C. § 1677e(a)(B).

Commerce was also correct to find that King Pac's withholding of information, its failure to submit information in the form and manner requested, and its failure to timely submit information constituted a significant impediment to the proceeding.  King Pac argues that Commerce was applying an impossible standard of perfection, but in fact Commerce followed the standard provided by the controlling statute, 19 U.S.C. § 1677e(a)(2), and that standard is not at all an impossible one. <u>See</u> <u>Gerber Food (Yunnan) Co., Ltd. v. United States</u>, 491 F. Supp. 2d 1326, 1337 (CIT 2007) ("[A] party's unresponsiveness and failure to cooperate prior to providing the needed and verifiable information might significantly and unnecessarily impede the proceeding.").

As Defendant states, several of the minor corrections that King Pac failed to submit were hardly trivial.  King Pac submitted corrections contained in the revised home market sales database that when fully set forth consisted of 79 pages, covering almost 3200 transactions. Defendant's Response at 23 (citing Letter from James R. Simoes, Hunton & Williams LLP, to Secretary of Commerce, Re: A-549-821—Polyethylene Retail Carrier Bags from Thailand: Sales Reconciliation of King Pac Industrial Co., Ltd. (June 27, 2006), P.R. 200, C.R. 87 ("Sales

Reconciliation") at 1).  Among the previously undisclosed information were changes [ up to a certain percentage and over a certain number of metric tons of plastic bags in individual transactions ]. Id. (citing Sales Reconciliation Ex. 6 at 43, 65).  The omissions by Plaintiff were significant and contained information necessary to the investigation; King Pac's failure to submit the information as requested impeded the process under 19 U.S.C. § 1677e(a).

        Additionally, Commerce properly determined that information submitted by King Pac could not be verified.  Commerce specifically identified information that it could not verify in its AFA Memo and it Verification Report, as well as in the I&D Memo.  According to Commerce,

> over the course of verification, we found numerous instances where King Pac's
> records did not support the information King Pac had reported in its various
> questionnaire responses.  In addition, when responding to the verification team's
> questions, King Pac company officials gave information that conflicted with
> information that King Pac had submitted for the record.  Further, King Pac
> significantly altered its sales data at verification without disclosing all the changes
> to the verification team.  Thus the verification team was unable to verify these
> changes.

I&D Memo cmt. 10, at 25.

        Commerce states in the Verification Report that it was unable to verify King Pac's home sales data because every sale trace failed Commerce's scrutiny. Verification Report at 19-25. Additionally, Commerce says that it was unable to verify the conversion factors used by King Pac, the reported sales quantities in kilograms, total shipment rate, billing adjustments, inland freight, brokerage and handling, international freight, marine insurance, or indirect selling expenses. Id. at 11, 14, 26-28, 30.  King Pac also left undisclosed changes to its data that Commerce says were "critical to the calculation of normal value," and which Commerce's verifiers did not discover until the last day of verification, leaving them with no opportunity to verify the information. AFA Memo at 3 (providing a list of six changes that were not disclosed). This evidence provided by the Department in the Verification Report, AFA Memo, and I&D

Memo establishes that Commerce was unable to verify information provided by King Pac, and thus Commerce properly resorted to facts available.

Thus, Commerce's decision that it could disregard all of King Pac's submissions is supported by substantial evidence and in accordance with law.  As Commerce found, King Pac failed to demonstrate that it acted to the "best of its ability" in responding to Commerce's requests, and thus Commerce is not required to consider King Pac's submissions because it did not meet all of the requirements of 19 U.S.C. § 1677m(e).  Plaintiff argues, citing Goldlink Indus. Co., Ltd. v. United States, 431 F. Supp. 2d 1323 (CIT 2006), that Commerce must use all information that was verified to calculate the dumping margin, Plaintiff's Brief at 26, but this is incorrect.  Here Commerce found that King Pac failed to act to the best of its abilities, whereas in Goldlink that was not the situation.[10]  Moreover, in this case, because information was withheld, untimely filed, or unverifiable, it became "impossible for [the Department] to calculate quantity and gross unit price for both U.S. market sales and foreign-market sales." I&D Memo cmt. 10, at 27.  As Defendant says, "[i]n such situations, Commerce is not required to cobble together the remaining information to produce an unreliable, inaccurate dumping margin." Defendant's Response at 31 (citing Steel Auth. of India, Ltd. v. United States, 25 CIT 482, 485-86, 149 F. Supp. 2d 921 (2001)).  Commerce was acting within its discretion when it chose to disregard King Pac's submissions and use facts available instead.

---

[10] In Goldlink, the court found that Commerce failed to support its decision to apply total AFA because the agency never indicated that the respondent was uncooperative, only that it was unable to reconcile some of the values provided by the respondent. 431 F. Supp. 2d at 1331.  Here, Commerce not only found that some of the information provided by King Pac could not be verified, it also correctly found that King Pac was uncooperative.

**2**
**Commerce was Correct to Apply Adverse Inferences when Selecting Amongst Facts
Otherwise Available on the Record**

Plaintiff argues that the Department's decision to apply adverse inferences was not supported by a proper finding that King Pac did not act to the best of its ability. Plaintiff's Brief at 22.  Plaintiff asserts that Commerce relies upon its finding that King Pac did not disclose all changes made to the home market sales database during verification to determine that King Pac did not act to the best of its ability, but, according to Plaintiff, even if this is true it would only be a basis for using facts available. Id. at 23.  Plaintiff adds that its failure to identify all of the changes made to the home market sales data was "simple inadvertence," and not justification for the application of adverse inferences. Id. at 23-24.  Additionally, Plaintiff argues that Commerce should have taken into consideration King Pac's "unfamiliarity with the U.S. antidumping investigation" and that King Pac's chief accountant resigned during the course of the review, and should not have ignored the remedial action taken by King Pac to provide a complete explanation of changes made to its home market sales database. Id. at 25.

Defendant responds that Commerce was permitted to apply an adverse inference because "it specifically found that King Pac had the ability to produce the information Commerce requested but failed to do so, and thus failed to act to the best of its ability." Defendant's Response at 32.  According to Defendant, King Pac had access to all the necessary information at the time it was requested, but nevertheless failed to provide that information to Commerce. Id. at 33.  Defendant also asserts that Plaintiff's argument that it meets the "best of its ability" standard because it  substantially cooperated with Commerce is incorrect; according to Defendant substantial cooperation is insufficient, as "a party does not cooperate to the best of its ability by providing only substantial cooperation when it has the ability to provide more cooperation.

'Best' means 'best,' not less than best." Id. at 34 (citing Plaintiff's Brief at 3).  Additionally

Defendant notes that, contrary to Plaintiff's argument that the Department's application of

adverse inferences was not supported by a proper finding because there were not separate

determinations, Commerce did make two separate determinations. Id. (citing Plaintiff's Brief at

22). As Defendant identifies them: "[f]irst, Commerce determined pursuant to 19 U.S.C. §

1677e(a) that King Pac withheld necessary information, failed to timely provide information,

significantly impeded the proceeding, and submitted information that could not be verified.

Second, pursuant to 19 U.S.C. § 1677e(b), Commerce separately determined that King Pac had

the ability to provide all of the requested information in a timely manner, but 'did not do so,' and

thus 'did not act to the best of its ability.'" Id. (citations omitted).

According to 19 U.S.C. § 1677e(b), Commerce may apply an adverse inference when a

party fails to cooperate with the agency to the best of its ability.  The Statement of

Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") makes clear

that Commerce may employ an adverse inference to "ensure that the party does not obtain a

more favorable result by failing to cooperate than if it had cooperated fully." SAA, Pub. L. No.

103-465, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 4199.  The "best of its ability" standard

found in 19 U.S.C. § 1677e(b) requires that a party "do the maximum it is able to do." Nippon

Steel, 337 F.3d at 1382.  King Pac does not even come close to meeting this standard.

Commerce determined that, though King Pac had all of the necessary information under its

control, King Pac failed to provide Commerce with the information it needed to make its

determination. AFA Memo at 5 (finding while conducting verification that King Pac "maintained

detailed records containing all the information necessary to provide a complete and accurate

[response]").[11]  Commerce concluded in its I&D Memo that "it was evident that all the necessary information existed and was recorded in King Pac's business records as they are kept in the normal course of business." Cmt. 10, at 26.

As Defendant asserts, Commerce properly made the finding that King Pac did not act to the best of its ability separately from its grounds for using facts otherwise available. See AFA Memo at 4-6 (determining first, pursuant to 19 U.S.C. § 1677e(a) that the use of facts available was appropriate, and second, pursuant to 19 U.S.C. § 1677e(b) that King Pac had the ability to provide necessary information but did not do so and "did not act to the best of its ability").  Thus, Commerce made a proper finding to use adverse inferences, and sufficiently supported it with evidence that King Pac failed to act to the best of its ability.

### 3
### Commerce Corroborated its Adverse Facts Available Rate Sufficiently.

Plaintiff argues that Commerce's chosen AFA rate was not sufficiently corroborated and not appropriate for the entries in question. Plaintiff's Brief at 26-27.  According to Plaintiff, Commerce should not have used the petition rate to establish the AFA rate because, "it was not corroborated by an independent source, [and] was not corroborated with the extent of showing reliability and relevance and failed to reflect an actual estimate" of the dumping margin. Id. Plaintiff says that information found in the petition is categorized by the SAA as secondary information, which must therefore be corroborated by independent information according to 19 U.S.C. § 1677e(c), and Commerce failed to do so in this case. Id. at 27-28 (citing SAA Pub. L. No. 103-465, at 870).  According to Plaintiff, Commerce corroborated the secondary information

---

[11] Defendant-Intervenors point out, "[t]he fact that King Pac was able to identify and explain the revisions to the sales data after verification demonstrates that King Pac had the ability to provide Commerce with this information before verification.  It is also worth noting that most of the undisclosed changes to the databases benefited King Pac." Polyethylene Retail Carrier Bag Committee et al.'s Response Brief to King Pac Industrial Co., Ltd.'s Motion for Judgment on the Agency Record ("Defendant-Intervenors' Response") at 24.

from the petition with "the same information in the petition which formed the basis for the allegation," which, Plaintiff says, taken to its logical conclusion means that Commerce can essentially render the corroboration provisions a nullity.  Id. at 29.

Plaintiff also argues that Commerce failed to show that the petition rate was reliable and relevant as there was no examination of the accuracy of the rate in light of other rates calculated in the investigation, no evidence that the rate was verified, and no evidence as to whether the cited transaction was aberrational or a regular sale in the ordinary course of business. Id. at 31. Plaintiff notes that the rate was compared with transaction-specific margins for two other producers in this review, but argues that this comparison if anything establishes that the petition rate is "uncorroborated and aberrational."[12] Plaintiff's Brief at 31-32 (citing Memorandum to Laurie Parkhill from Richard Rimlinger: Polyethylene Retail Carrier Bags from Thailand— Transaction Specific Company Margins (January 9, 2007), C.R. 131).  Plaintiff also points out that out of all of the transactions examined during this period of review, [ a certain number of transactions ] exceeded the petition rate, which Plaintiff asserts is further evidence of its unreliability. Id. at 34.  Additionally, Plaintiff argues that the petition rate is not relevant as Commerce claims it is, and in fact the "large gap between the petition rate and the dumping margin calculated by Commerce for any cooperative respondents" should be enough to question the relevance and reliability of the petition rate. Id. at 35-36.

Finally, Plaintiff asserts that Commerce should not have used the petition rate because it does not reflect an estimate of King Pac's dumping margin and is therefore punitive in nature. Id. at 36.  According to Plaintiff, the rate should reasonably reflect the company's margin during the

---

[12] Plaintiff points out that of the top six transaction specific margins, [ a certain number ] exceeded the petition rate, and an examination of the high margins show them to be aberrational. Plaintiff's Brief at 32.  For example, Plaintiff looks to [ a certain company's ] two highest margins of [ a certain percentage and another certain percentage ], both of which were based on "similar" rather than "identical" matches, and its average margin of [ a certain percentage ], which Plaintiff contends is overstated because "it was calculated by Commerce using the WTO impermissible methodology of zeroing negative margins." Id. at 32-33.

specific period of review, not any dumping of subject merchandise at any time. Id. at 37.  King

Pac compares its situation to that of the Plaintiffs in Shandong Huarong General Group Corp. v.

United States, No. 01-00858, 2007 Ct. Int'l. Trade LEXIS 3 (CIT January 9, 2007), and

concludes that its culpability was less than theirs and that "if [King Pac's] conduct did rise to the

level of where the application of Adverse Facts was appropriate, such conduct barely reached

such level." Plaintiff's Brief at 38.  Plaintiff asserts that the multiple applied to King Pac should

accordingly be no greater than the multiple applied in Shandong Huarong: 1.3 to 2.5 times the

duty. Id.

       Defendant responds that Commerce relied upon three factors to determine the rate was

adequately corroborated: (1) that it was the highest rate previously applied to a member of the

King Pac group,[13] (2) price quotations and affidavits found in the petition, and (3) individual

transactions margins from others in the same segment. Defendant's Response at 35.  Defendant

argues that the AFA rate applied to Zippac, a company in the King Pac group is the "most

probative evidence of current margins." Id. at 38 (quoting Rhone Poulenc, 899 F.2d at 1190).

Defendant also argues that the unpublished price quotations and affidavits from the petition used

by Commerce qualify as independent information rather than secondary information because

they were accompanied by the company officials' affidavits, and thus, they "maintain the same

quantum of reliability" as published price lists. Id. at 39-40.  Defendant further argues that

Commerce's use of transaction-specific margins for other companies shows that the AFA rate

selected reflects commercial practices in the industry. Id. at 40.  According to Defendant, the low

number and volume of individual transaction margins and the calculated rates referred to by

---

[13] This rate applied to Zippac, which in this review was one of several companies, along with King Pac, that were collapsed and treated as a single entity. Memorandum from Catherine Cartsos to Laurie Parkhill, Collapsing of King Pac Industrial Co., Ltd. (KPI), Dpac Industrial Co., Ltd. (Dpac), Zippac Co., Ltd. (Zippac), and King Bag Co., Ltd. (King Bag) (August 31, 2006), P.R. 225, C.R. 104.

Plaintiff do not invalidate the AFA rate applied by Commerce. Id. at 40-41.  Instead, Defendant

asserts that the "individual transactions relied upon demonstrated that even cooperative

respondents had sales with high dumping margins." Id. at 41.  Finally, Defendant refutes

Plaintiff's argument that Commerce's selection of an AFA rate is limited to 1.3 times to 2.5

times the actual margin cap, saying, "[n]othing in Shandong Huarong or other applicable law sets

any numerical ceiling upon Commerce's ability to select an AFA rate." Id. at 42.

When Commerce uses secondary information as a source of coroborration, it "shall, to

the extent practicable, corroborate that information from independent sources that are reasonably

at [its] disposal." 19 U.S.C. § 1677e(c).  Secondary information is information that is "derived

from the petition that gave rise to the investigation or review, the final determination concerning

the subject merchandise, or any previous review . . . concerning the subject merchandise." SAA,

Pub. L. No. 103-465, at 870.  In order to corroborate secondary information, the Department

must find that "the secondary information to be used has probative value." Id.  While Congress

has "tempered deterrent value with the corroboration requirement," when dealing with an

uncooperative party, "Commerce is in the best position, based on its expert knowledge of the

market and the individual respondent, to select adverse facts that will create the proper deterrent

to non-cooperation with its investigations and ensure a reasonable margin." F. Lii De Cecco Di

Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  The

result of this is a "particularly great" level of discretion granted by statute to the agency in

situations involving respondents that do not cooperate. Ta Chen Stainless Steel Pipe, Inc. v.

United States, 298 F.3d 1330, 1338-39 (Fed. Cir. 2002) ("In the case of uncooperative

respondents, the discretion granted by the statute appears to be particularly great.").

In this case Commerce relied on three factors to establish that the selected AFA rate was appropriate. First, Commerce chose the highest prior rate assigned to a company in the King Pac group. AFA Memo at 7-8.  This is appropriate because the company upon which the rate is based, Zippac, is closely related to King Pac,[14] and because it is within the discretion of Commerce to resort to the highest prior rate in the assumption that it is an accurate reflection of the current margins. <u>Rhone Poulenc, Inc. v. United States</u>, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (finding that the presumption in favor of the highest prior rate "reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced <u>current</u> information showing the margin to be less"); <u>Shanghai Taoen Int'l Trading Co., Ltd. v. United States</u>, 29 CIT 189, 197, 360 F. Supp. 2d 1339 (2005).

The second factor Commerce used to corroborate its AFA rate was price quotes accompanied by affidavits by company officials, which were submitted as source documentation with the petition. AFA Memo at 7.  Though Plaintiff argues these cannot be used because they do not qualify as independent information, Commerce's determination that these price lists are different from information based on lists from market research because they are accompanied by affidavits from company officials is not outside of the agency's discretion in finding adequate corroboration.

The third factor used by Commerce was a determination that the transaction-specific margins for other companies in the initial investigation corroborate that the selected AFA rate

---

[14] Zippac was one of the companies collapsed with King Pac in this review.  King Pac and Zippac are further connected because King Pac purchased all of Zippac's production for its export sales and subcontracted the production to Zippac during the period of review. Letter from Jay C. Campbell, White & Case LLP to Secretary of Commerce, King Pac Questionnaire Response (November 23, 2005), P.R. 36, C.R. 2 section A at 6, 11.  Zippac was given the highest margin in the last review because it failed to respond to Commerce's inquiries; Commerce determined in that review that the rate assigned to Zippac in that review was properly corroborated. <u>Notice of Final Determination of Sales at Less than Fair Value: Polyethylene Retail Carrier Bags from Thailand</u>, 69 Fed. Reg. 3,552, 3,554 (January 26, 2004).

continues to give an accurate reflection of commercial practices in the industry. AFA Memo at 8. Upon examining this information, Commerce found "high-volume transaction-specific margins for cooperative companies which are both higher than the 122.88 percent petition rate and are close to that rate." I&D Memo cmt. 11, at 30.

The chosen rate is required to have "some relationship to commercial practices in the industry" and "a relationship to the actual sales information available." Ta Chen, 298 F.3d at 1339, 1340. However, contrary to Plaintiff's assertion that Shandong Huarong provides a numerical limit to the AFA rate Commerce can choose, nothing in the relevant case law sets such a cap. See Shandong Huarong, 2007 Ct. Int'l. Trade LEXIS 3 (holding that Commerce must find an AFA rate that is reliable, up to date, and that bears some relationship to the particular respondent in question); De Cecco, 216 F.3d at 1032 (noting that Commerce is "in the best position" to determine which adverse facts should be used in finding a rate that is both appropriate and an adequate deterrent to noncooperation). The law makes it clear that Commerce's determination of rates must be legal, reasonable, and supported by evidence, but is unfettered by absolute numerical limitations. Here Commerce used evidence on the record to establish that rates for cooperating companies in this review can fall in a range above and near the AFA rate chosen for King Pac, and no interested party submitted any information that called into question the relevance of the information that was used. See AFA Memo at 8; I&D Memo cmt. 11, at 30. Thus, Commerce's chosen AFA rate was sufficiently corroborated, supported by sufficient evidence, and in accordance with law.

**B**
**Commerce Lawfully Applied the Provisional Measures Cap to King Pac's Entries**

The Committee argues that Commerce's decision to apply the provisional measures cap to King Pac's entries was in error. Polyethylene Retail Carrier Bag Committee et al.'s Rule 56.2

Brief in Support of Motion for Judgment on the Agency Record ("Defendant-Intervenors'

Brief") at 7.  According to Defendant-Intervenors, the provisional measures cap should be

applied at the cash deposit rate that was lawfully required on Zippac's merchandise, rather than

the cash deposit rate actually collected, as Commerce instructed Customs. Id. at 8.   The

Committee asserts that the statute is clear that the cap applies to differences between the amount

"required as security for an antidumping duty" and the final assessment amount, and that this

interpretation of 19 U.S.C. § 1673f(a) "is consistent with Commerce's reading of the automatic

assessment regulation, which requires Commerce to '[a]ssess antidumping duties . . . at rates

equal to the cash deposit of, or bond for, estimated antidumping duties . . . required on that

merchandise at the time of entry. . . .'" Id. (quoting 19 C.F.R. § 351.212(c)(1)(i)).  Because terms

used in different parts of the same statute or regulation presumptively have the same meaning,

the Committee reasons, "the phrase 'cash deposit . . . required' should be construed to have the

same meaning throughout the Tariff Act of 1930," and therefore should be interpreted to mean

the amount assigned by Commerce to Zippac in its preliminary review: 122.88%. Id. at 9 (citing

Gustafson v. Alloyd Co., 513 U.S. 561, 570. 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995);

Preliminary Determination, 69 Fed. Reg. at 3,554).

      According to Defendant-Intervenors, the proper rate to use when applying the provisional

measures cap in this case is 122.88% because there is no difference between the rate required as

a result of the preliminary determination and the rate assigned in the final assessment. Id. at 10.

Here, Defendant-Intervenors say, Commerce decided to cap its assessments at an erroneous cash

deposit amount because merchandise that should have been entered at the 122.88% cash deposit

rate was given a rate of 2.8% because it was incorrectly entered as King Pac-produced

merchandise. Id.  The Committee contends that this is not only inconsistent with the statute, but

also creates a policy that rewards exporters for incorrect entries; "[i]t sends a clear signal that underpayments of cash deposits--whether through fraud or mistake--cannot be corrected for entries during the provisional measures cap period." Id.  As Commerce has a responsibility to apply the law in a manner that prevents evasion of antidumping duties, Defendant-Intervenors reason, it is necessary to liquidate the merchandise at 122.88%. Id. at 10-11.

Defendant responds that, contrary to the Committee's contentions, the language, legislative history, and judicial and agency interpretations of 19 U.S.C. § 1673f(a)(1) all support Commerce's application of the provisional measures cap. Defendant's Response at 43. According to Defendant, the plain language and legislative history indicate Congress' intention that duties be capped at the amount "collected" or "posted," and refer to a completed past event rather than something that can be revisited. Id. at 44 (citing Trade Agreements Act of 1979, Pub. L. No. 96-39, § 101, 93 Stat. 144, 173-74 (1979); Statement of Administrative Action accompanying the Trade Agreements Act of 1979, H.R. Doc. No. 96-153, pt. II, at 427-28 (1979), reprinted in 1979 U.S.C.C.A.N. 665, 695 ("1979 Trade Act SAA"); S. Rep. No. 96-249, at 77, reprinted in 1979 U.S.C.C.A.N. 381, 463; H.R. Rep. No. 96-317, at 70).  Defendant asserts that the 1996 amendment changing the statutory language from "the amount of the cash deposit collected as security" to "the amount of cash deposit, or the amount of bond or other security, required as security for an estimated antidumping duty" was necessary only to ensure to that the statute could expand to encompass bonds, which are posted rather than collected, and not to alter how the cap is applied. Id. at 45.  Defendant also notes that the Court of Appeals for the Federal Circuit used language such as "the deposit" and "the deposited amount" to explain where the cap limits collection. Id. at 46 (citing Thai Pineapple Canning Indus. Corp. v. United States, 273 F.3d 1077, 1086 (Fed. Cir. 2001)).  Additionally, Defendant contends that Commerce has construed

the analogous countervailing duty cap provision consistently with its application of the

antidumping provision since it was enacted. Id. at 47.

According to Defendant, the Committee's argument that the amount is capped at what

should have been collected is incorrect, and the authority that Defendant-Intervenors cite from

Mittal Canada, Inc. v. United States, 461 F. Supp. 2d 1325 (CIT 2006), supporting that assertion

is at most dicta and needs not be followed here. Id. at 48.  Defendant also asserts that the

Committee's contention that 19 C.F.R. § 351.212(d), Commerce's regulation applying 19 U.S.C.

§ 1673f(a), refers to what should have been done is incorrect, and that in fact, "[t]he regulation . .

. explicitly points back to what is known at the time of Commerce's preliminary determination."

Id. at 49.  Defendant further notes that Commerce did not make a determination in this review

regarding when King Pac may have exported Zippac produced merchandise to the United States,

and therefore even if accepted the rate could not be raised during the provisional-measures

period. Id.  Finally, Defendant asserts that it does not dispute the principle articulated by

Defendant-Intervenors that Commerce must interpret the antidumping statute in a manner that

prevents circumvention of the law, but adds that "Commerce must act within the confines of the

law.  Here, Commerce is constrained by the unambiguously expressed intent of Congress to cap

collection of duties at the amount collected as estimated antidumping duties upon entry." Id. at

49-50.

The provisional measures cap in 19 U.S.C. § 1673f(a)(1) provides,

Deposit of estimated antidumping duty under section 1673b(d)(1)(B) of this title.
If the amount of a cash deposit, or the amount of any bond or other security,
required as security for an estimated antidumping duty under section
1673b(d)(1)(B) of this title is different from the amount of the antidumping duty
determined under an antidumping duty order published under section 1673e of
this title, then the difference for entries of merchandise entered, or withdrawn
from warehouse, for consumption before notice of the affirmative determination
of the Commission under section 1673d(b) of this title is published shall be--

(1) disregarded, to the extent that the cash deposit, bond, or other security is
lower than the duty under the order . . . .

Commerce interpreted the provision to cap collection of duties at the amount actually collected
or posted, saying, "when [Commerce] determines a new duty as the result of an administrative
review that is higher than the deposit of the estimated duty posted during the provisional
measures period, the difference cannot be collected and the duty for entries during the
provisional-measures period remains capped at the deposit rate." I&D Memo cmt. 12, at 32.  The
legislative history surrounding the statute describe the cap as "security posted" and "cash deposit
collected," all implying that this relates to an action completed in the past rather than an
aspirational amount as Defendant-Intervenors argue. 1979 Trade Act SAA at 427-28; S. Rep.
No. 96-249, at 77; H.R. Rep. No. 96-317, at 70.

To the extent that ambiguity remains in the interpretation of the statute, when Congress'
intent is not clear, the court will "defer to the agency's interpretation of the statute if it falls
within the range of permissible construction." Delverde, SrL v. United States, 202 F.3d 1360,
1363 (Fed. Cir. 2000).  The Court of Appeals for the Federal Circuit has interpreted the cap
provision, explaining that, "the cap provision prohibits the collection of the difference between
the duty determined by the investigation and the deposited amount. . . . Thus, when Commerce
determines a new duty as the result of an administrative review that is higher than the deposit of
the estimated duty, the difference cannot be collected . . . ." Thai Pineapple, 273 F.3d at 1086-87.
This language clearly limits the rate based on the deposited amount, not an amount that a final
determination indicates should have been deposited.

The Committee also claims that 19 C.F.R. § 351.212(d) implies that the cap should apply
to the amount of duties that should have been collected rather than what actually was collected.
Defendant-Intervenors' Brief at 7-9.  The regulation reads, in pertinent part:

> If the amount of duties that would be assessed by applying the rates included in the Secretary's affirmative preliminary or affirmative final antidumping or countervailing duty determination ("provisional duties") is different from the amount of duties that would be assessed by applying the assessment rate under paragraphs (b)(1) and (b)(2) of this section ("final duties"), the Secretary will instruct the Customs Service to disregard the difference to the extent that the provisional duties are less than the final duties, and to assess antidumping or countervailing duties at the assessment rate if the provisional duties exceed the final duties.

19 C.F.R. § 351.212(d). The regulation refers to what is known and what would be assessed due to findings in the preliminary determination, and does not indicate any preference to change rates based on later findings.  At the time of the preliminary determination in this case there had not yet been a determination of who produced the merchandise exported by King Pac that entered during the preliminary measures period.  Therefore, Commerce's application of the provisional measures cap as applying to the amount collected rather than the amount that should have been collected was a proper interpretation of the controlling statute and regulation.

## V
## CONCLUSION

For the above stated reasons, Commerce's determination in Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg. 1,982 (January 17, 2007) is AFFIRMED.


__/s/ Evan J. Wallach_____
Evan J. Wallach, Judge


Dated:          August 28, 2008
                New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL POLYBAG CO., LTD., et al., : | |
| Plaintiffs, : | |
| : | Before:        WALLACH, Judge |
| v.        : | Consol. Court. No.:   07-00043 |
| : | |
| UNITED STATES,      : | |
| Defendant,    : | |
| : | |
| and     : | |
| : | |
| POLYETHYLENE RETAIL CARRIER   : | |
| BAG COMMITTEE, et al.,     : | |
| : | |
| Defendant-Intervenors.   : | |

## ORDER AND JUDGMENT

This case having come before the court upon the Motion for Judgment on the Agency Record filed by Plaintiff King Pac Industrial Co., Ltd. ("Plaintiff's Motion") and Motion for Judgment on the Agency Record filed by Defendant-Intervenors Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation ("Defendant-Intervenors' Motion"), the court having reviewed all pleadings and papers on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that Plaintiff's Motion is DENIED; and it is further

ORDERED, ADJUDGED and DECREED that Defendant-Intervenors' Motion is DENIED; and it is further

ORDERED, ADJUDGED and DECREED that the United States Department of Commerce's determination in Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg. 1,982 (January 17, 2007), is AFFIRMED; and it is further

ORDERED that all parties shall review the court's Opinion in this matter and notify the court in writing on or before Friday, September 5, 2008, whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter.  The parties shall suggest alternative language for any portions they wish deleted.  If a party determines that no information needs to be deleted, that party shall so notify the court in writing on or before September 5, 2008.

Dated: August 28, 2008                        /S/        Evan J. Wallach
      New York, New York                              Judge

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                         Deputy Clerk